UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAPE WATERMAN, INC., d/b/a SEA TOW CAPE & ISLANDS,

Plaintiff,

v.

M/V AVA PEARL (O.N. 1238374), her engines, boilers, tackle and appurtenances, etc., *in rem*, and RHODE ISLAND FAST FERRY, INC., *in personam*,

Defendants.

Civil No. 19-10523-LTS

FINDINGS OF FACT AND CONCLUSIONS OF LAW

June 3, 2021

SOROKIN, J.

On May 27, 2018, the AVA PEARL lost all engine power off the coast of Martha's Vineyard and called "mayday". Vessels operated by Sea Tow Cape & Islands responded and, with some assistance from the Tug SIRIUS, towed the AVA PEARL into dock. Plaintiff Cape Waterman, Inc., doing business as Sea Tow Cape & Islands ("Sea Tow") now brings a claim for salvage against Defendants M/V AVA PEARL and Rhode Island Fast Ferry, Inc. Following a bench trial, the Court hereby issues its findings of fact and its conclusions of law as required by Federal Rule of Civil Procedure 52(a). For the reasons that follow, the Court awards salvage in the amount of $66,500.

I. FINDINGS OF FACT

The AVA PEARL is a 105' high-speed catamaran passenger ferry owned by Rhode Island Fast Ferry and is insured for $5,000,000.[1] It has a draft of 2' at the bow and 6' at the stern. The vessel has two hydraulically powered rudders and is equipped with a modern ride control system to level the ride for the comfort of its passengers. The AVA PEARL has a freeboard of 8.5' and its Sea Keeping Guide indicates the vessel can travel at full speed in waves of 8' or under. The vessel carries only one anchor.

On May 27, 2018, the AVA PEARL was engaged in its regular route between Oak Bluffs, Massachusetts (Martha's Vineyard) and Quonset Point, Rhode Island (North Kingstown) with sixty-seven passengers onboard. The crew consisted of Captain Anthony Bessinger and three others.

The AVA PEARL departed Oak Bluffs at 11:43 a.m. The wind was out of the east-northeast with wind speeds of fifteen to twenty-five knots. The tide was just beginning to go out and wave heights were at all relevant times between four and six feet. The Court credits the testimony of Captain John Packer, who crewed the Tug SIRIUS that day, that the waters around Oak Bluffs can be difficult to navigate, even "violent", when the wind blows from the northeast.

While clearing the jetties which protect the Oak Bluffs harbor, the AVA PEARL struck three waves, each between 3' and 6' in height, in quick succession. The AVA PEARL's two main engines immediately lost power and the vessel began to drift west-northwest, perpendicular to (and slightly towards) the shore. Unbeknownst to Captain Bessinger, the waves had caused a

[1] The factual findings in the text of this memorandum and decision are made after the Court heard live testimony from Captain Anthony Bessinger, Captain Tyler Noveletsky, Captain Paul Bangs, Mr. Ralph Packer, Captain John Packer, Captain Randy Chason, Mr. Joseph Leonardo, III, and Captain Matthew Plauche on April 5, 2021 and April 6, 2021. The following findings are based upon the credible evidence found by the Court. In a few instances, for clarity, the Court explains testimony it rejects but otherwise the omission of contrary testimony reflects the Court's conclusion that the testimony was either not credible or not accurate.

small portable heater he kept with him in the wheelhouse to bounce, striking the engines' emergency stop buttons. The emergency buttons, which are located directly before Captain Bessinger's station, prevent the vessel's engines from starting or operating until and unless they are disengaged. Captain Bessinger did not realize the emergency stop buttons had been depressed, and so his attempts to restart the engines from the wheelhouse proved unavailing. Captain Bessinger, aware of the approaching shoreline, ordered his crew to prepare to drop the vessel's only anchor and personally proceeded to the stern to reset the engines in the AVA PEARL's engine rooms. At no time did Captain Bessinger disengage the emergency stop buttons or realize that these buttons were engaged. He then returned to the wheelhouse, where he again tried and failed to restart the engines. Captain Bessinger observed that his crew had deployed the anchor incorrectly—leading the anchor line (or rode) over the passenger railing rather than through the central deck opening—but nonetheless ordered them to drop anchor without delay because redeploying the anchor, in his words, "would have taken more time than I thought we had." At 11:46 a.m., Captain Bessinger issued a "mayday" distress call.[2]

The AVA PEARL continued to drift northwest until the anchor secured to the seafloor. As the rode became taut, the vessel began to lay into the wind, meaning the AVA PEARL swung around until its bow pointed out to sea and its stern pointed towards the shore. The increasing tension on the rode caused the passenger railing over which it had been improperly run to break. Without the passenger railing to support it, the rode began to press against the vessel's gunwale (the upper edge of the vessel's hull). The AVA PEARL's passenger railing is supported by

[2] There are three levels of urgency to maritime distress calls. The first is sècuritè, which is used to signal information about the safety of navigation. The second is pan-pan, which is used to signal an urgent situation which is not immediately life threatening. The third is mayday, which signals a potentially disastrous threat or danger.

aluminum stanchions rising intermittently from the gunwale. As the vessel turned into the wind, the rode sought the ship's centerline and pressed against one of these stanchions, which it partially wrapped around. Although the passenger-facing sides of these stanchions are polished, the forward-facing sides (such as the one against which the rode now pressed) are not. Because the rode was hooked on this stanchion, and thus could not reach the vessel's centerline, the vessel did not ride anchor straight into the wind but rather with a pivot or twist. Captain Bessinger noticed that the rode connecting the AVA PEARL to its one and only anchor was pivoting against two pieces of metal. He was sufficiently concerned by the risk of chafing this created that he felt compelled to station a crew member to watch for signs of wear in the line.

Once the AVA PEARL's anchor caught and the vessel had laid into the wind, the AVA PEARL was between 200 and 300 feet from the leeward shore.[3] In conversations with the Coast Guard, Captain Bessinger stated that the vessel's anchor was holding, but stressed that the vessel was "right off the beach" and that he needed towing assistance "as soon as possible." The shoreline before which the AVA PEARL rode anchor is almost entirely sandy beach and there were no rocks or debris in the area. There are wooden pilings at one point along the beach and further to the northwest there is a pier owned by a local yacht club. Had the AVA PEARL come loose from its anchor, the vessel would have been driven onto the beach by the northeastern wind. Due to the conflicting wind and currents in the area, it is impossible to accurately predict whether the AVA PEARL, had its anchor slipped, would have struck the pilings or the pier

[3] Captain Tyler Noveletsky testified that, from the perspective of the SEATOW DEFENDER when it arrived on the scene, the AVA PEARL was within 75 yards, or 225 feet, of the beach. Captain Bessinger testified the vessel was within three or four boat lengths, or 300 to 400 feet of the beach. The Court concludes that the upper bound of Captain Bessinger's estimate is inconsistent with the evidence presented at trial, including but not limited to the AVA PEARL's GPS log. In any event, these differences are not material to the Court's decision.

before grounding. Given the layout of the shoreline and the position of the vessel, however, it is more likely the AVA PEARL would have grounded first.

Within three minutes of the AVA PEARL's mayday distress call, the SEATOW DEFENDER got underway from Falmouth, Massachusetts and radioed to let the Coast Guard and the AVA PEARL know it was coming. The SEATOW DEFENDER is a 25' rigid hull inflatable response vessel equipped with two 225 horsepower outboard motors. It was crewed on that day by Captain Jason Kulas and by Captain Tyler Noveletsky, a new employee in training. SEATOW DEFENDER is valued at $155,000 and is one of a fleet of similar vessels owned by Sea Tow, the plaintiff in this action. Captain Noveletsky testified at the bench trial, but Captain Kulas could not be located.

Captain Bessinger remained in intermittent communication with the Coast Guard as SEATOW DEFENDER and a Coast Guard vessel made their way to Oak Bluffs. During the course of these communications, Captain Bessinger informed the Coast Guard that the AVA PEARL's anchor appeared to be holding, but also expressed concern that the anchor might begin to drag. Captain Bessinger further reported that he had ordered the passengers to don life jackets and that he was continuing to attempt to restart the engines. Again, these restart efforts failed because the emergency stop buttons were still engaged.

SEATOW DEFENDER and a Coast Guard vessel arrived on scene nearly simultaneously, at around 12:10 p.m. At 12:15 p.m. the Coast Guard broadcast a pan-pan notice, signaling the situation involving the AVA PEARL had become less urgent.

Upon arriving, the SEATOW DEFENDER briefly surveyed the situation by navigating around the AVA PEARL, before approaching the AVA PEARL to pass a tow rope. Communication between the crews of the AVA PEARL and SEATOW DEFENDER was limited

to coordinating the effort to tow the AVA PEARL to deeper water and, ultimately, back to harbor. The questions of payment or salvage were not discussed. The first two attempts to pass a tow rope to the AVA PEARL were unsuccessful, but on the third try the crews of the SEATOW DEFENDER and the AVA PEARL managed to make the tow rope fast. Each attempt required the SEATOW DEFENDER to maneuver alongside the AVA PEARL while Captain Noveletsky threw a tow rope to a crew member of the AVA PEARL. After successfully securing the tow line, the SEATOW DEFENDER then began to tow the AVA PEARL out towards deeper water and Captain Bessinger gave his crew the order to cut the anchor line. Once the vessels were far enough from shore, the SEATOW DEFENDER turned towards the northwest to make its way towards Vineyard Haven Harbor, rounding a protruding portion of Martha's Vineyard known as the East Chop.[4] Because the AVA PEARL's rudders operate using a hydraulic system powered by the vessel's engines, the rudders were locked and the vessel sheered to one side, requiring the SEATOW DEFENDER to reduce the speed of the tow.

The journey from where the AVA PEARL lay at anchor to the docks at Vineyard Haven Harbor was roughly three miles. While rounding the East Chop, the vessels were met by the Tug SIRIUS, which had also mustered to respond to the AVA PEARL's distress call. It was decided that, once the vessels were in the lee of the East Chop, were sea conditions were calmer, the Tug SIRIUS would take over the tow from the SEATOW DEFENDER. The SEATOW DEFENDER relinquished the tow after taking AVA PEARL for roughly two miles. Thereafter, Tug SIRIUS took the AVA PEARL for the final mile into Vineyard Haven. Once at the docks, the SEATOW DEFENDER and several other Sea Tow vessels assisted the Tug SIRIUS in docking the AVA

[4] All agreed it would not have been prudent to tow the AVA PEARL back into Oak Bluffs Harbor due to the narrowness of that harbor's jetties, making Vineyard Haven Harbor the nearest safe harbor.

PEARL. The AVA PEARL was secured to the south dock on the east side of Vineyard Haven Harbor at 1:10 p.m. The passengers were disembarked and provided with alternative transportation. The incident concluded without any injuries.

Several hours later, the Tug SIRIUS, again with the assistance of several Sea Tow vessels, moved the AVA PEARL to a different dock. Sometime thereafter Captain Bessinger realized that the emergency stop buttons were engaged. He released the buttons (a simple manual task) and the AVA PEARL's engines roared to life without further incident. Neither the engines nor the props nor any part of the propulsion system had suffered any damage in the surf exiting Oak Bluffs. The engine failure arose only because Captain Bessinger's portable heater hit and depressed the emergency stop buttons.

That same day, Captain Bessinger met with Captain Ramsey Chason, who owns Sea Tow. Captain Bessinger thanked Captain Chason and told him that Sea Tow had, in his own words, "saved our [the AVA PEARL's] ass." Captain Bessinger declined, however, to make any agreement over how Sea Tow ought to be compensated for its efforts, explaining he was not the AVA PEARL's owner. Captain Chason then contacted the AVA PEARL's owner, Rhode Island Fast Ferry, to negotiate compensation. Charles Donadio, on behalf of Rhode Island Fast Ferry, thanked Captain Chason for his assistance and offered to pay a towing bill. Captain Chason rejected this offer, asserting that Sea Tow's efforts exceeded that of a simple tow and that Sea Tow was entitled to a salvage award.

After further negotiation failed, Sea Tow launched the present action on March 20, 2019. The Court held a bench trial in person on April 5, 2021 and April 6, 2021. The only claim at issue is Sea Tow's demand for salvage. The parties filed proposed findings of fact and conclusions of law on April 26, 2021.

## II. CONCLUSIONS OF LAW

### A. Sea Tow's Claim for Marine Salvage

"The admiralty doctrine of salvage, which rewards volunteers who save ships from dangers at sea, is an equitable doctrine that dates back to the Romans." Faneuil Advisors, Inc. v. O/S Sea Hawk, 50 F.3d 88, 92 (1st Cir. 1995) (citing B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 337 (2d Cir. 1983)). Its purpose is to provide "an inducement to seamen and others to embark in such undertakings to save life and property." The Blackwall, 77 U.S. 1, 14 (1869). To establish a claim of salvage, Sea Tow must prove three elements: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success." The Sabine, 101 U.S. 384, 384 (1879). Defendants concede the second and third elements have been satisfied, Doc. No. 88 at 16,[5] meaning the only question is whether the AVA PEARL was in marine peril.

To determine whether the AVA PEARL was in marine peril, the Court looks to the vessel's situation "at the time the services [were] rendered." New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc., 240 F. Supp. 2d 101, 112 (D. Mass. 2003) (citing Fine v. Rockwood, 895 F. Supp. 306, 309 (S.D. Fla. 1995)). "Marine peril occurs when a vessel is exposed to any actual or apprehended danger which might result in her destruction." Clifford v. M/V Islander, 751 F.2d 1, 5 (1st Cir. 1984). It "is not necessary . . . that the danger be immediate or absolute," The Plymouth Rock, 9 F. 413, 416 (S.D.N.Y. 1881), but, nonetheless, "the threat must be something

---

[5] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

more than the inevitable deterioration that any vessel left untended would suffer." Faneuil Advisors, 50 F.3d at 93.

Applying these principles, the Court holds the AVA PEARL was in marine peril. There is no question the AVA PEARL was in a dire situation when its engines first failed, and Captain Bessinger issued his mayday distress call. See Markakis v. S/S VOLENDAM, 486 F. Supp. 1103, 1108 n.18 (S.D.N.Y. 1980) ("A master's requests for assistance are strong evidence that a marine peril is genuine and that the salvor's efforts, if voluntary and successful, are worthy of reward.") (citations omitted). Although the AVA PEARL's situation became less pressing once its anchor had been deployed, arresting its journey towards the shore, this does not mean that the vessel was free from all peril. When the SEATOW DEFENDER arrived to render aid, the AVA PEARL's engines were disabled, its rudders were inoperable, the vessel was riding anchor only 200 to 300 feet from a lee shore, and its anchor was deployed improperly. See JSM Marine LLC v. Gaughf, 407 F. Supp. 3d 1358, 1373 (S.D. Ga. 2019) ("[A] vessel's loss of its capacity to maneuver, either by engine failure or otherwise, generally constitutes marine peril.") (citing Klein v. Unidentified Wrecked & Abandoned Sailing Vessel, 758 F.2d 1511, 1515 (11th Cir. 1985)). True, the anchor appeared to be holding. But Captain Bessinger's communications with the Coast Guard reveal he was concerned this might change and that the anchor might begin to drag. Moreover, the incorrect deployment of the anchor had created a further risk: because the rode was caught between two pieces of metal there was a meaningful fear that the rode would begin to chafe or fray. Although this risk is impossible to quantify, it was sufficiently cognizable that Captain Bessinger stationed a crew member to watch the line.[6]

---

[6] The Defendants' reliance on Fine v. Rockwood, 895 F. Supp. 306 (S.D. Fla. 1995), is misplaced. In that case, a vessel with a hole in its hull was able to maneuver itself to dock, where it was tied off and then settled to the bottom. 895 F. Supp. at 309–10. The Fine Court held that

It must be acknowledged the AVA PEARL was not truly disabled; its engines were only offline because an errant bounce had brought a portable heater into contact with the engines' emergency stop buttons. Had the crew known what we know now, the engines could have easily been restarted at any time. But the determination of peril "must be made in light of the circumstances as they appeared at the time of the [salvage] and not from hindsight." In re City of N.Y., 534 F. Supp. 2d 370, 377 (E.D.N.Y. 2008) (citations omitted). To all aboard, the AVA PEARL appeared to be dead in the water, riding anchor until help could arrive.

For these reasons, the Court holds Sea Tow has established its claim for marine salvage.

B. The Salvage Award

Once a salvage claim is established, the Court must determine what award is owed to the salvor. Sea Tow submits that a total award of $750,000 is warranted while Defendants seek an award in the range of $4,200 to $10,500. See Doc. No. 115 at 42–44; Doc. No. 116 ¶ 194.

An award for marine salvage is determined upon a "just estimate of all the circumstances of each particular case." The Emulous, 8 F. Cas. 704, 707 (C.C. Mass. 1832). Long ago, in The Blackwall, 77 U.S. 1, 14 (1869), the United States Supreme Court set out six factors district courts should consider in determining salvage awards. Courts today continue to apply these factors in setting salvage awards. Arranged in descending order of importance, these factors are:

> (1) degree of danger from which the property was rescued; (2) value of the property saved; (3) risk incurred in saving the property from the impending peril; (4) promptitude and skill displayed; (5) value of the property employed by the salvors and the danger to which it was exposed; and (6) labor expended in rendering the salvage service.

---

subsequent efforts to repair the hull did not entitle the plaintiffs to salvage because the moment of peril, if any, had passed. Id. at 310. Here, in contrast, the AVA PEARL was not safely at dock and was still at risk when the salvage was performed.

Wijsmuller, 702 F.2d at 339 (citing 3A M. Norris, Benedict on Admiralty § 237 (6th ed. 1980)); see also Brown v. Johansen, 881 F.2d 107, 109 (4th Cir. 1989) (citing, with approval, the Second Circuit's reordering of the Blackwall factors in Wijsmuller). In addition, some courts have held that "a professional salvor is entitled to a more liberal award than a chance salvor." Wijsmuller, 702 F.2d at 340 (citing The Lamington, 86 F. 675, 684 (2d Cir. 1898)). The Court analyzes each of these factors in turn.

The degree of danger from which the AVA PEARL was rescued was not particularly great. The vessel was riding at anchor and was not faced with imminent danger. The conditions were moderate, with 4' to 6' waves, and the vessel's anchor was holding fast. True, the vessel was unable to navigate and faced the risk its anchor might come loose. The vessel therefore was in marine peril and required salvage. But even had the vessel come free from its anchor, the AVA PEARL would, most likely, have grounded on the sandy beach to its stern. The risk of a beach grounding should not be overlooked, of course, as the AVA PEARL's hull, rudders, and exposed engine props might well have been damaged, necessitating repairs and potentially costing Rhode Island Fast Ferry some amount of lost income. A grounding would also almost certainly have damaged Rhode Island Fast Ferry's reputation as a passenger ferry company. And, of course, it is impossible to rule out the chance the AVA PEARL might have collided with one of the small number of obstacles in the vicinity before grounding. But, viewed in perspective, there was little risk to the safety of the AVA PEARL's passengers or crew, and the risk to the vessel itself, while real, was not overwhelming and the consequences of a materialized risk would not jeopardize the entire vessel.

The parties have stipulated that the value of the property saved, the AVA PEARL, was $5,000,000. Doc. No. 91 at 5.

The risk incurred by the salvors in securing the property was limited. "It is the risks out of the ordinary for men of that calling which are recognized and liberally rewarded in salvage cases." Wijsmuller, 702 F.2d at 340. The Court rejects Captain Noveletsky's description of the risks involved in reaching the AVA PEARL. Captain Noveletsky testified the SEATOW DEFENDER overcame 8' to 12' waves on the journey from Falmouth to Oak Bluffs, but nautical buoys in the area, and impartial eyewitnesses, report much more moderate seas. What is more, Captain Chason, who made essentially the same journey just minutes after Captain Noveletsky, disagreed with Captain Noveletsky's description of the seascape, offering a much less turbulent picture. Sea Tow's vessels are designed to respond quickly in trying conditions and Sea Tow's captains must, by the nature of their work, be prepared to operate in rough seas. The Court therefore concludes the SEATOW DEFENDER faced little risk in its voyage to the AVA PEARL. Once on scene, however, the SEATOW DEFENDER faced some amount of risk. The sea conditions were choppy, and the SEATOW DEFENDER therefore exposed itself to some risk in approaching the AVA PEARL to assess the situation and again in coming up on the much larger vessel to pass the tow rope. During the tow itself, the SEATOW DEFENDER was at some risk of tripping or rolling, and this risk was magnified by the rough seas. What's more, the AVA PEARL's rudders were frozen, meaning the SEATOW DEFENDER had to struggle to keep the much larger vessel in line, adding to the overall risk.

Sea Tow and its employees demonstrated great promptitude, skill, and energy in rescuing the AVA PEARL. The crew of the SEATOW DEFENDER were in their vessel and on their way to the AVA PEARL within minutes of the initial distress call. They completed the journey from Falmouth to Oak Bluffs with dispatch, arriving on scene within roughly twenty-five minutes. Soon after arriving, the SEATOW DEFENDER was joined by several other Sea Tow vessels, all

ready to give aid. The swift response of these other vessels reinforces that Sea Tow maintains itself in a constant state of readiness to aid vessels in distress and that Sea Tow's crews respond to developing situations with considerable energy.[7] During the actual rescue, the SEATOW DEFENDER's crew conducted themselves well in challenging circumstances. Not only is the AVA PEARL much larger than the SEATOW DEFENDER, but the AVA PEARL's rudders were locked over to starboard, making it difficult to keep the vessel in line during the tow. The Court credits the testimony of Captain Packer of the Tug SIRIUS, who praised the crew of the SEATOW DEFENDER's efforts, explaining that the SEATOW DEFENDER was not the type of vessel one would ordinarily have chosen to tow the AVA PEARL in those sea conditions.

The value of the property employed by the salvors, and the risk to which this property was exposed, was modest but not insignificant. Generally, in weighing this factor, "[t]he court should consider the expense of maintaining a salvage service company in addition to the property employed in this particular situation." New Bedford, 240 F. Supp. 2d at 118. Sea Tow maintains, at some expense, a fleet of eight vessels.[8] Several of these vessels are kept crewed and ready to respond twenty-four hours a day, 365 days a year. On the day in question, Sea Tow dispatched three vessels to aid the AVA PEARL: the SEATOW DEFENDER, valued at $155,000.00, the

---

[7] The Court here finds that the SEATOW RHIB and the SEATOW RESPONDER are co-salvors but that the Tug SIRIUS is not. Although the SEATOW RHIB and SEATOW RESPONDER only rendered physical aid towards the end of the operation, by helping dock the AVA PEARL, the evidence at trial established that they worked with and supported the SEATOW DEFENDER during the initial moments of peril outside of Oak Bluffs. This is enough, given the unusual facts of this case. In contrast, the Tug SIRIUS's participation in the operation only began after the peril had passed, after the AVA PEARL had reached a point of relative safety. See Sea Tow Portland/Vancouver v. Yacht HIGH STEAKS, No. CV-06-985-HU, 2007 WL 2994502, at *4 (D. Or. Oct. 12, 2007) ("The salvage, once begun, continues until the salvaged vessel reaches a place of safety, which means a place where it is no longer in actual or apprehended danger."). The Court commends all involved, including the crew of the Tug SIRIUS, for their willingness to aid a vessel in need.

[8] The parties did not submit evidence on the total value of Sea Tow's fleet.

SEATOW RHIB, and the SEATOW RESPONDER (the last two being valued at $224,000 collectively). Doc. No. 91 at 5. Captain Chason testified that Sea Tow incurs significant fixed costs in maintaining itself at this level of readiness.[9] Although the value of Sea Tow's vessels is not a great amount when compared to the value of a vessel such as the AVA PEARL, the loss of any would be sorely felt by Sea Tow. Only the SEATOW DEFENDER, however, was exposed to any amount of risk during the salvage.

Little labor or material was expended in rendering the salvage service. The SEATOW DEFENDER towed the AVA PEARL for roughly thirty-five minutes over two miles before relinquishing the vessel to the Tug SIRIUS. In the ordinary course, Sea Tow charges non-members (such as Rhode Island Fast Ferry) $350 for an hour of towing operations. Even if the Court were to look beyond the time spent in tow, as Sea Tow argues, and consider the roughly six hours the SEATOW DEFENDER spent on the operation, from its departure from Falmouth until its return, this would result in only $2,100 in labor costs. Multiplied to reflect the efforts of the SEATOW RESPONDER and SEATOW RHIB, Sea Tow's labor costs come to $6,300 (at most). All agree that Sea Tow employed no materials in effectuating the salvage, other than its tow line. These minimal costs weigh against a liberal award.

Finally, the Court considers the "long standing and widely recognized" policy of granting professional salvors premium pay for successful completion of their services. New Bedford, 240 F. Supp. 2d at 119. "Where professional salvors expend considerable time and effort in preparing to render effective service, such preparation to provide prompt, skillful, and energetic service should be rewarded with a liberal salvage award." H.R.M., Inc. v. S/V Venture VII, 972 F. Supp.

[9] Captain Chason testified that each actual hour of towing operations costs the company roughly $1,600, when fixed costs are considered. He also conceded, however, that the hourly cost was significantly lower, perhaps $350, when only variable costs were considered.

92, 96 (D.R.I. 1997); accord Wijsmuller, 702 F.2d at 340. In the case at bar, the Court finds Sea Tow is a professional salvage company. Sea Tow maintains eight vessels, and stands ready to provide around-the-clock assistance to vessels in distress. The company crews its vessels year-round with experienced and qualified sailors, and its promptitude during the salvage of the AVA PEARL demonstrates that it responds with energy and dispatch when called upon. The Court notes, however, Captain Packer's testimony that the SEATOW DEFENDER was not necessarily the best choice of craft for towing a vessel as large as the AVA PEARL, somewhat undermining the evidence of Sea Tow's preparedness, though there was no evidence of a more suitable private vessel available from Sea Tow or any other provider.[10] Considering all of these circumstances, the Court nonetheless finds that Sea Tow has sufficiently shown it is a professional salvage service and therefore should be entitled to a more liberal salvage award.

Having reviewed the record and the factors enumerated in The Blackwall, the Court must now determine the salvage award. In setting the award, the Court must strike a balance: the award must be enough that it will encourage salvors to come to the aid of vessels in distress, but not so much that it discourages at-risk vessels from accepting help for fear of incurring too great a liability. See Am. Petrol. Co. v. The Veendam, 46 F. 489, 494–95 (S.D.N.Y. 1891). The challenge is "not to award so little as to discourage salvage aid, nor so much as to encourage unnecessary or exaggerated service." The No. 92, 252 F. 117 (2nd Cir. 1918). With these principles in mind, and after careful consideration of the evidence submitted at trial and each of the Blackwall factors, the Court finds that a salvage award of $66,500 is appropriate.

C. Apportionment

[10] True, a Coast Guard vessel was on the scene. But the undisputed evidence at trial revealed that since the early 1980's the Coast Guard has maintained a policy of standing down in favor of private towing companies whenever reasonably practical.

Apportionment of salvage awards between the owner and the crew of a salving vessel is committed to the discretion of the Court. See Bartholomew v. Crowley Marine Servs., Inc., 337 F.3d 1083, 1090 (9th Cir. 2003). Although there is no "fixed rule," the owner of a salving vessel "generally receives a greater proportion of the total award than its crew." Waterman S.S. Corp. v. Dean, 171 F.2d 408, 412 (4th Cir. 1948). This is because the "salving vessel, rather than the efforts of a crew, usually plays the central role in facilitating the success of a salvage operation" and thus vessel owners must be induced "to maintain vessels with sufficient power and equipment to perform salvage services efficiently." DOROTHY J v. City of N.Y., 749 F. Supp. 2d 50, 77 (E.D.N.Y. 2010); cf. Conekin v. Lockwood, 231 F. 541, 544–45 (E.D.S.C. 1916) (attributing this general rule to the rise of steamships and the demise of sailing vessels). The undisputed evidence at trial showed that Captain Noveletsky will be paid 5% of the net recovery made by Sea Tow in this action pursuant to his employment agreement. The Court finds this to be an adequate award and will not make a further allocation to Captain Noveletsky. Captain Chason testified at trial that Captain Kulas had breached his employment agreement with Sea Tow (in a manner unrelated to the present action) and that Captain Kulas therefore had no contractual right to recover a percentage of the award from Sea Tow. Captain Kulas's whereabouts are unknown, he did not testify at trial, and he has not made any claim for an award. Under the totality of the circumstances, the Court will not grant Captain Kulas an award. The Court also makes no specific award to the crews of the SEATOW RHIB and SEATOW RESPONDER as they did not participate sufficiently in the salvage to warrant a share. Thus, the award is to Sea Tow, with no award to Captain Noveletsky because Sea Tow has represented that he will receive his award from Sea Tow by contract.

D. Interest and Costs

Finally, Sea Tow seeks to recover interest and costs. Defendants have not opposed Sea Tow's request, but argue any prejudgment interest should be calculated using the rate of interest for ten-year treasury bonds.

Federal Rule of Civil Procedure 54(d) provides generally for costs to be awarded to the prevailing party. Taxable costs under 28 U.S.C. § 1920 are therefore awarded to Sea Tow as the prevailing party. Sea Tow is further awarded post-judgment interest in accordance with 28 U.S.C. § 1961. See New Bedford, 240 F. Supp. 2d at 119.

In federal question cases, including admiralty cases, the rate of prejudgment interest awarded is a matter committed to the discretion of the court. See DOROTHY J, 749 F. Supp. 2d at 80 (citing Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 63 (3d Cir. 1986) ("In federal question cases, the rate of prejudgment interest is committed to the discretion of the district court.")); see also Mentor Ins. Co. (U.K.) v. Brannkasse, 996 F.2d 506, 520 (2d Cir. 1993) ("It is firmly established that . . . the rate of pre-judgment interest is within the broad discretion of the district court.") Ensuring that the salvor receives compensation for the loss of money to which they are entitled, rather than a windfall, guides the exercise of the Court's discretion. See City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 197 (1995) ("[P]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation."). In several seminal cases from towards the end of the Nineteenth Century, the Supreme Court, in an exercise of discretion, awarded interest at the applicable state prejudgment interest rate. See Cambria S.S. Co. v. Pittsburgh S.S. Co., 212 F. 674, 676–77 (6th Cir. 1914) (surveying Supreme Court precedent adopting state-set prejudgment interest rate and concluding this was an "exercise of discretionary power"). More recently, in two District of Massachusetts cases, a Judge has also exercised her discretion, based on the facts and circumstances of each case, to also award the

applicable state prejudgment interest rate. See New Bedford, 240 F. Supp. 2d at 119; Joseph v. J.P. Yachts, LLC, 436 F. Supp. 2d 254, 274 (D. Mass. 2006). Here, however, the Court concludes the Massachusetts prejudgment interest rate of 12 percent, as set forth in Mass. Gen. Laws ch. 231, § 6H, is excessive and would provide Sea Tow with a windfall rather than with compensation. That said, the Court also finds that federal post-judgment rate, as set in 28 U.S.C.A. § 1961, is insufficient to compensate Sea Tow. Under §1961(a) the rate of post-judgment interest is the weekly average one-year constant maturity Treasury yield for the week preceding entry of the judgment and is compounded annually. Currently, that rate is 0.04 percent. See H.15 Selected Interest Rates, Federal Reserve, https://www.federalreserve.gov/releases/h15/ (last accessed June 1, 2021). After considering the facts of the case, the Court awards Sea Tow prejudgment interest at the rate of 5 percent per annum for the time period from the salvage to the judgment.

## III. CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiff Cape Waterman, Inc., doing business as Sea Tow Cape & Islands, is awarded $66,500 in salvage, costs taxable under 28 U.S.C. § 1920, and prejudgment interest at the rate of five percent per annum. Judgment accordingly.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge